IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DERON SCOTT,                    )
          Petitioner,           )
                                )
          vs.                   )  Civil Action No. 05-1081
                                )  Judge Donetta W. Ambrose
LOUIS FOLINO,                   )  Magistrate Judge Amy Reynolds Hay
          Respondent.           )

REPORT AND RECOMMENDATION

I.   RECOMMENDATION

It is respectfully recommended that the Petition for Writ of
Habeas Corpus be denied and that a certificate of appealability
be denied.

II.  REPORT

Petitioner, Deron Scott, has filed a Petition for Writ of
Habeas Corpus pursuant to 28 U.S.C. § 2254, wherein he challenges
his life sentence for Murder in the Second Degree and related
robbery and firearms violations.  In his Petition, he raises the
following claims for relief.

> 1.  The trial court erred in rufusing [*sic*] to
>     suppress the statement of which was the
>     result of an illegal arrest, where the arrest
>     was without warrant and based upon
>     insufficient probable cause, which violated
>     petitioner's rights under the Fourth and
>     Fourteenth Amendments of the U.S.
>     Constitution.
>
> 2.  The pcra [*sic*] court erred in refusing to
>     grant Petitioner new trial for Sixth and
>     Fourteenth amendment violation based on
>     ineffectiveness of appellate counsel who
>     failed to raise Sixth and fourteenth
>     amendment layered ineffective counsel claim
>     that trial counsel rendered ineffective
>     assistance by not objecting to hearsay
>     testimony of Commonwealth witness Brandi
>     Bouldin, where hearsay violated petitioner's
>     right to confront witnesses against him under

the confrontation clause of the Sixth and
Fourteenth amendment and prejudiced
petitioner's case.

3.    The pcra [*sic*] court erred in refusing to
grant Petitioner new trial for Sixth and
Fourteenth amendment violation based on
ineffectiveness of appellate counsel who
failed to raise Sixth and Fourteenth
amendment layered ineffective counsel claim
that trial counsel rendered ineffective
assistance by not objecting to hearsey [*sic*]
testimony of Commonwealth witness Dennis
Logan, where hearsey [*sic*] violated
petitioner's right to confront witness
against him under the confrontation clause of
the Sixth and Fourteenth amendment and
prejudice petitioner's case.

4.    The pcra [*sic*] court erred in refusing to
grant Petitioner new trial for Sixth and
Fourteenth amendment violation based on
ineffectiveness of appellate counsel who
failed to raise Sixth and Fourteenth
amendment layered ineffective counsel claim
that trial counsel rendered ineffective
assistance by not moving to suppress the
statement of petitioner based on the fact the
later finding of probable cause to support
the warrantless arrest of petitioner was not
founded by a neutral and detached magistrate,
which violates petitioner's Fourth and
Fourteenth amendment rights under the U.S.
Constitution.

5.    The pcra [*sic*] court erred in refusing to grant
Petitioner new trial for Sixth and
Fourteenth amendment violation based on
ineffectiveness of appellate counsel who
failed to raise Sixth and Fourteenth
amendment layered ineffective counsel claim
that preliminary hearing counsel rendered
ineffective assistance of counsel by failing
to preserve the testimony of the preliminary
hearing in CC9207144.  The lost of the
transcript deprived petitioner of his rights
to Equal Protection of the law under the
Fourteenth Amendment of the U.S.

6.    The pcra [*sic*] court erred in refusing to
grant Petitioner new trial for Sixth and

2

Fourteenth amendment violation based on ineffectiveness of appellate counsel who failed to raise Sixth and fourteenth amendment layered ineffective counsel claim that trial counsel rendered ineffective assistance because he represented an actual conflict of interest by refusing to raise ineffective counsel claim against prior counsel, from the same office, who also was ineffective for representing an actual conflict of interest when he never raised ineffective counsel claim against preliminary hearing counsel for failing to pretect [*sic*] petitioners equal protection right to transcript.  Petitioner suffered an adverse effect from this layered conflict of interest claim, which amounted to a constructive denial of counsel because it left him counsel-less at critical stage of proceeding.

A.    <u>Relevant Facts</u>

The relevant facts, as set forth by the trial court, are as follows.

The facts adduced at trial indicate that on March 25, 1992, at approximately 1:30 a.m., the Pittsburgh Police Department received a call to investigate a possible homicide in the Homewood-Brushton area of Pittsburgh.  The call was made by a friend of the victim, who found him in his home with a gunshot wound to the head.  Officer Smallwood was the first officer to report to the scene, and testified that the residence appeared to have been "ransacked." Detectives arrived directly and the crime scene was processed.  Detective Logan noted that the victim's pants pocket was "ruffled up, it was disturbed."

An autopsy was conducted later that morning by the coroner's office, and the death was ruled a homicide, placing the time of death as within the previous 24-30 hours. The bullet was recovered from the body, and sent to the crime lab.  A gunshot residue kit was prepared, which later proved negative, ruling out the possibility of suicide.

3

In early April the detectives received an anonymous phone call from a female who provided information concerning the homicide. Based on that information, they interviewed two females, Brandi Boulding and Tammy Bradshaw.  Ms. Boulding testified that the Defendant had introduced her to the victim at an earlier occasion, and she had in fact learned about his death while watching television with the Defendant.

Ms. Boulding testified that sometime shortly after that, the Defendant phoned her and asked her to go next door to his cousin's house and retrieve an object wrapped in a towel that he had placed in an empty aquarium.  (The Defendant's cousin being Tammy Bradshaw).  She was to "go into the dining room, act like I needed to use the bathroom, and recover something."  Ms. Boulding found the object, opened it, found it to be a gun, and told Ms. Bradshaw. Neither of them wanted anything to do with the gun, so they called the Defendant's brother, Harold Scott, and he picked it up the next day.  Ms. Boulding later told the Defendant that she had given the gun to his brother, and that the Defendant was a "little upset," and that he wanted her to get it back."

The detectives then interviewed Harold Scott, who informed them that he sold the gun to a juvenile named "Jermaine."  "Jermaine" was eventually located by phone, and he told the detectives where to find the gun.  They went to the apartment where "Jermaine" had directed them, and retrieved the weapon. Ballistic tests later conducted by the Crime Lab confirmed that test bullets fired from the weapon conclusively matched the evidence bullet taken from the victim's body.

The Defendant was arrested on April 7, 1992.  After being read his rights, he proceeded to give the detectives a statement, in which he confessed to his involvement in the crime.  In short, he admitted to buying the weapon, plotting the robbery with an accomplice, and serving as a "look-out" while the accomplice went into the victim's home

and robbed him.  He states he heard a gun-
shot, and that his accomplice ran out of the
house, saying "I glocked him."  The Defendant
further stated that he was given the murder
weapon by the accomplice to dispose of, which
he subsequently hid at his cousin's house.
He also told the detectives that he threw the
remaining bullets on the roof of the
Pittsburgh National Bank in Wilkinsburg where
they were in fact later retrieved by
Pittsburgh City Police.  In his statement,
the Defendant admitted that he asked Ms.
Boulding to get the gun back from his
brother, for the expressed purpose of
implication someone else.  The Commonwealth
offered the testimony of a convicted burglar
who testified to inculpatory statements made
by the Defendant to him while both were
incarcerated between April 9-12, 1992.

The sole evidence offered by the
Defendant was offered through Detective
Logan, who was recalled to testify to a
letter sent by Defendant to the coroner,
recanting his earlier confession.

Tr. Ct. Op., 5/19/1994, at pp. 2-4 (Commw. Ex. 16) (internal
record citations omitted) (doc. no. 14).

On April 20, 1993, in the Court of Common Pleas of Allegheny
County, Pennsylvania, a jury found Petitioner guilty on all
charges.  Petitioner unsuccessfully sought relief from his
convictions in state court on direct appeal and in a post-
conviction proceeding pursuant to the Pennsylvania Post-
Conviction Relief Act (PCRA).  Having exhausted available state
court remedies as required by the federal habeas corpus statute,
Petitioner filed with this Court a Petition for Writ of Habeas
Corpus pursuant to 28 U.S.C. § 2254 wherein he raises the claims
set forth above.

B.   Standard of Review

In reviewing state court criminal decisions, a federal court must accord a presumption of correctness to the state court's factual findings, which a petitioner can rebut only by clear and convincing evidence.  28 U.S.C. § 2254(e).  Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it."  Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000).  In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly.  Id. (citing Marshall v. Lonberger, 459 U.S. 422, 433 (1982)).

A federal court may not issue the writ unless it concludes that the state court's adjudication resulted in a decision that was "contrary to," or an "unreasonable application of," clearly established federal law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1).  In Williams v. Taylor, 529 U.S. 362 (2000), Justice O'Connor, writing the opinion of the Court for Part II, discussed the independent meanings of the "contrary to" and "unreasonable application" clauses contained within section 2254(d)(1).

> Under the "contrary to" clause, a federal
> habeas court may grant the writ if the state
> court arrives at a conclusion opposite to
> that reached by this Court on a question of
> law or if the state court decides a case

> differently than this Court has on a set of
> materially indistinguishable facts.  Under
> the "unreasonable application" clause, a
> federal habeas court may grant the writ if
> the state court identifies the correct
> governing legal principle from this Court's
> decisions but unreasonably applies that
> principle to the facts of the prisoner's
> case.

Williams, 529 U.S. at 411-13.  *See also* Lockyer v. Andrade, 538 U.S. 63 (2003).

The Supreme Court further clarified that a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.  Williams, 529 U.S. at 409.  "Under §2254(d)(1)'s unreasonable application clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  These standards apply to mixed questions of fact and law, such as whether trial counsel provided effective assistance of counsel.  Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000), *cert. denied*, 121 S.Ct. 1621 (2001).

C.   Failure to Suppress

Petitioner's first claim is that the trial court erred in failing to suppress his inculpatory statements.  Petitioner asserts that his statements should have been suppressed because there was no probable cause for his arrest, he was subject to duress in giving his statement, there were procedural

irregularities in the statement process, and counsel failed to call Petitioner as a witness to challenge the Commonwealth's evidence.  Petitioner invokes the protections of the Fourth, Fifth and Fourteenth Amendments.

The Supreme Court of the United States has explained that there are two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence:  the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.  Dickerson v. United States, 530 U.S. 428, 433 (2000) (citing Bram v. United States, 168 U.S. 532, 542 (1897) (stating that the voluntariness test "is controlled by that portion of the Fifth Amendment ⋯ commanding that no person 'shall be compelled in any criminal case to be a witness against himself' ") and Brown v. Mississippi, 297 U.S. 278 (1936) (reversing a criminal conviction under the Due Process Clause because it was based on a confession obtained by physical coercion)).

With regard to the voluntariness of Petitioner's confession, in Miranda v. Arizona, 384 U.S. 436, 467 (1966), the Supreme Court determined that a custodial police interrogation inherently involved "compelled" testimony for purposes of the Fifth Amendment.  To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, the Court imposed an obligation on the police to follow certain procedures when dealing with persons accused of criminal conduct. These procedures, referred to as "Miranda" warnings, require the

8

police, *prior* to the initiation of questioning, to inform the accused of the right to remain silent, the right to have an attorney present, that the accused is suspected of involvement in criminal activity and that any statement made by the accused may be used by the police as evidence against him. *Id*. at 468-470. Beyond this duty to inform, the <u>Miranda</u> rule requires the police to respect an accused's decision to exercise the rights protected by the Miranda warnings. Thus, the police are required to cease interrogation if the accused indicates that he wishes to remain silent or if he states that he wants an attorney. *Id*. at 473-474. Failure to honor such a request results in suppression of statements made by an accused after he has made such a request. <u>Oregon v. Elstad</u>, 470 U.S. 298, 307 (1985) (the failure to administer Miranda warnings creates an irrebuttable presumption of compulsion that prohibits the prosecution from using such statements in its case in chief, even with respect to statements that are otherwise voluntary within the meaning of the Fifth Amendment).

Moreover, an accused may waive the rights protected by the Miranda warnings, provided the waiver is made voluntarily, knowingly and intelligently. <u>Miranda</u>, 384 U.S. at 444. In this regard, the prosecution may seek to admit statements made by an accused during a custodial interrogation if it can demonstrate that the accused waived his Miranda rights, the waiver was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and that the waiver was made with a full

9

awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *See, e.g.*, <u>Moran v. Burbine</u>, 475 U.S. 412, 425 (1986).

With regard to Petitioner's Fourth Amendment rights, an arrest made without probable cause violates the Fourth Amendment. The determination of probable cause for arrest is an objective test requiring an evaluation of all the information the arresting officer had when he made the arrest.  The question is whether the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.  <u>Malley v. Briggs</u>, 475 U.S. 335, 345 (1986)).  Thus, the critical analysis under the Fourth Amendment is the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.  <u>Maryland v. Wilson</u>, 519 U.S. 408 (1997) (citations omitted). "Probable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." <u>Orsatti v. New Jersey State Police</u>, 71 F.3d 480, 482-83 (3d Cir. 1995).

Generally, statements that result from an illegal detention are not admissible under the exclusionary rule.  <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).  However, the Supreme Court has recognized that persons arrested illegally frequently may decide to confess as an act of free will unaffected by the

10

initial illegality of arrest.  <u>Brown v. Illinois</u>, 422 U.S. 590

603 (1975).   Thus, there is no *per se* rule that all statements

following illegal arrests must be suppressed.   Instead, a court

must consider the following factors in deciding whether to

suppress such statements: (1) the "important factor" of whether

Miranda warnings were given; (2) the "temporal proximity of the

arrest and the confession"; (3) the "presence of intervening

circumstances"; and (4) the "purpose and flagrancy of the

official misconduct."  <u>Brown</u>, 422 U.S. at 603-04.

    In the instant action, the trial court conducted a

suppression hearing on April 13, 1993.  At that hearing,

Pittsburgh Police Detective Dennis Logan testified that he and

Detective Terry O'Leary arrested Petitioner for the homicide of

Arthur Glenn while Petitioner was in the bullpen in the Allegheny

County Courthouse in custody on other charges.   Trial Transcript

(TT), pp.5-6, Vol. I.  Officers Logan and O'Leary identified

themselves, told Petitioner he was under arrest for the murder of

Arthur Glenn and informed him they were taking him to the Gateway

View Plaza for questioning.  When they arrived, they took

Petitioner to room 1587 and read Petitioner his <u>Miranda</u> warnings

from a pre-printed form and then gave the form to Petitioner to

read for himself.  Petitioner signed the form in front of the

officers acknowledging he understood his rights and that he was

willing to answer questions without the presence of a lawyer.

TT, p. 7-11, Vol. I.  Petitioner proceeded to tell the officers

about the murder of Arthur Glenn.  He did not appear intoxicated

or under the influence and at no time did he refuse to answer questions or indicate he did not want to talk anymore.  TT, pp. 11-13, Vol. I.  Detective Logan testified that, after Scott signed the release, he interviewed Scott and wrote down Scott's statements.  TT, pp. 10-11, Vol. I.

The trial court concluded that the interrogating officers read Petitioner his <u>Miranda</u> rights and that Petitioner himself read and signed the pre-interrogation warning form without coercion, duress and/or fraud.  Commw. Ex. 20, p. 4.  In so concluding, the trial court credited Detective Logan's testimony that Scott had been given adequate Miranda warnings, had signed a written waiver, freely gave his statement, did not request an attorney, and that he did not show any signs of intoxication.

In its review of this claim, the Superior Court made the following findings.

> There was probable cause for the arrest. Police received an informants' report that Deron Scott committed the murder and that he had secreted the weapon used at a specific residence.  Police interviewed the resident who confirmed that she found the gun and gave it to appellant's brother, who in turn sold it to an individual from whom it was eventually recovered.  As stated, the gun was found to be the instrument of the shooting. This basic information was presented to the coroner's office and a warrant for appellant's arrest issued.  Appellant, who was already in custody on other charges, was arrested and taken to Gateway View Plaza where he was interviewed.  He was told that he was under arrest and the charges against him.  The Miranda warnings were given, a record of this was kept, which appellant reviewed and signed.  He gave an oral statement which the detective recorded on

12

notes and which appellant acknowledged orally
as correct. Appellant did not hand write his
own statement and refused to have the
interview taped.  It is apparent that the
court accepted the Commonwealth's
uncontradicted evidence which showed the
statement of appellant to have been
voluntarily given, with proper warnings and
pursuant to a proper arrest.  The failure to
call the appellant at the suppression hearing
is of no consequence as there is no proffer
as to what the substance of his testimony
would be.  Appellant has, in fact, tacitly
admitted to the inculpatory nature of his
statement, in that he later wrote to the
coroner in an attempt to retract his
statement.  There is no requirement that a
statement be taped or that a verbatim
transcript of the statement must be taken and
preserved.  There is not the slightest
evidence that the interrogation of appellant
was accompanied by any threats, intimidation
or promises.  We find no error in the court's
refusal to suppress the statement of
appellant or its usage at trial.

Superior Court Memorandum, 2274 PGH 1998, at 3-4 (doc. no. 14-9)

(citations omitted).

In addition, the trial court noted that Detectives Marroway

and O'Leary filed a written complaint with the Coroner's Office

on April 7, 1992, and that an affidavit of probable cause was

properly filed at that time.  The facts set forth in the

affidavit provided that the victim had done electrical work for

Scott.  Following an anonymous tip, the detectives interviewed

Brandi Boulding and Tammy Bradshaw during which they learned that

Scott had hidden a gun at the house of his cousin, Tammy

Bradshaw, and asked Boulding to recover it.  When Boulding found

out it was a gun, she told Bradshaw and they called Scott's

brother, Harold, who came and picked up the gun and eventually

13

sold it.  The detectives interviewed Harold who corroborated the women's story and told the detectives he sold the gun to "Jermaine."  The detectives then called Jermaine who told them the location of the gun.  The police sent the gun to the crime laboratory where testing showed that the bullet from the victim matched the recovered gun.  Under the Fourth Amendment objective test, these facts are more than sufficient to lead a reasonable person to believe Scott had committed a crime.  Tr.Ct.Op. at p. 8 (Commw. Ex. 16) (doc. no. 14).

Petitioner has not demonstrated that the Pennsylvania courts' determinations are contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  He has not submitted any evidence that his confession was not voluntary and has not shown that there was no probable cause for his arrest.[1] Thus, he has not demonstrated that the Pennsylvania courts' decisions are based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Finally, he has failed to demonstrate by clear and convincing evidence that the state courts' factual determinations are incorrect.  Consequently, Petitioner is not entitled to habeas corpus relief with respect to his claim regarding suppression of his confession.

---

1.  Moreover, his Fourth Amendment claim does not provide any basis for habeas relief as the state afforded him a full and fair opportunity to litigate his fourth amendment claim.  *See* Stone v. Powell, 428 U.S. 465 (1976).

D.    Ineffective Assistance of Counsel

Petitioner's remaining claims assert ineffective assistance of counsel.  The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial."  Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)).

> Thus the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Fretwell, 506 U.S. at 369 (citing United States v. Cronic, 466 U.S. 648, 658 (1984)).  See also Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect).

The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance:  1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense.  Strickland, 466 U.S. at 687.  To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct.  Strickland, 466 U.S. at 690.  A petitioner

who claims that he or she was denied effective assistance of counsel carries the burden of proof.  Cronic, 466 U.S. at 658.

The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy."  Id. at 689. The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place.  Id.

The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable.  Strickland, 466 U.S. at 689.  To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694.  A "reasonable probability" is one that is sufficient to undermine confidence in the outcome.  Id.

      1.   Failure to object to hearsay statements.

Petitioner claims that his trial counsel rendered ineffective assistance for failing to object to several hearsay

16

statements made by witness Brandi Boulding (TT. pp. 100-118) and Detective Dennis Logan (TT. pp. 4-20, 60-104).  With respect to Boulding, she testified that she and Petitioner were close friends and that she lived next door to his cousin, Tammy Bradshaw.  Boulding's testimony concerned her actions in retrieving the gun from Bradshaw's house.  Specifically, she testified that Petitioner called her from jail and asked her to go to Bradshaw's house and take and object he had secreted there in an aquarium and get rid of it.  TT. pp. 104-106.  When Boulding found out the object was a gun, she told Bradshaw and they called Petitioner's brother and told him to come get it. TT. pp. 107-108.

In its review of this claim, the Superior Court held as follows.

> We agree with the PCRA court that even if Brandi Boulding's statement that Appellant told her to retrieve a weapon for him from a location in which he had hidden it could be considered hearsay, Ms. Boulding's testimony in this regard constituted a very small portion of the evidence received against Appellant. Testimony was adduced in this case for more that four full days.  Ms. Boulding's testimony was very brief and consisted almost entirely of a recitation of her own actions in locating and dealing with the handgun in question.  N.T., 4/14/93, at 101-118.  Her reference to Appellant's command to her comprised a simple statement.  We conclude that the PCRA court was correct in ruling that Appellant has failed to demonstrate how, in light of the quantum of evidence adduced against him, Ms. Boulding's brief reference to his instructions to her could be deemed to have created "prejudice" as that term is defined by Pennsylvania law.

Sup. Ct. Op. at p. 10 (Commw. Ex. 46) (doc. no. 15).

In his Memorandum in Support of his Petition, Petitioner complains about Boulding's testimony that Bradshaw contacted Harold Scott and asked him to come over and pick something up. He also complains about her testimony that Harold and Bradshaw told her that Harold was coming over to Bradshaw's house.

This Court agrees that, even assuming that improper hearsay statements were introduced during Petitioner's trial, he is not entitled to relief under the harmless error standard applicable for federal habeas corpus review.   In this regard, in Brecht v. Abrahamson, 507 U.S. 619 (1993) the Supreme Court announced a new standard for harmless error on collateral review:  whether, in light of the record as a whole, the error resulted in "actual prejudice" to the defendant.  Actual prejudice occurs when the constitutional error " 'had substantial and injurious effect or influence in determining the jury's verdict.' "  Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  When a federal habeas court finds a constitutional trial error and is in grave doubt about whether the error had a substantial and injurious effect or influence in determining the jury's verdict, the error is not harmless and the petitioner is entitled to relief.  O'Neal v. McAninch, 513 U.S. 432, 436 (1995).  Grave doubt exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."  Id. (internal citation omitted).

18

In the case at bar, Petitioner admitted the following during his interrogation. He and another person, Darious Greene, had driven to New York where Petitioner bought a .357 Magnum handgun for $200.00. On the way back to Pittsburgh, Petitioner gave the gun to Greene because Greene wanted to hold on to it. On Friday, March, 20, 1992, Petitioner ran into Greene on Singer Place where they smoked a joint (TT. p. 70, Vol. II). After they finished, Greene told Petitioner they needed more dope and Petitioner told him that he had just given the victim, Arthur Glenn, $300.00 to do some electrical work in his apartment. He and Greene agreed to walk up to Nimick Place where Glenn lived to rob him. Greene went inside and Petitioner stood lookout. About 10 to 20 minutes later, he heard a gunshot. Five minutes later, Greene came outside with a bloody rag in his hand. As they were walking back to Singer Place, Greene told Petitioner he had "glocked" him. He then gave Petitioner back the gun and told him it was "dirty." Petitioner then told Logan that he took the gun to the house of his cousin, Tammy Bradshaw, and stashed it there. (TT. pp. 71-77, Vol. II).

Detective Logan testified that he made notes while Petitioner gave his statement. Afterwards, Logan read the story back to Petitioner as he had set it forth in his notes. Then he allowed Petitioner to review his notes. He asked Petitioner if there were any changes he needed to make because it would be typed up in a report after they were finished interviewing him.

Petitioner said, "No.  That's the way it happened."  (TT. Vol. II. p. 80).

The trial testimony further indicates that the police eventually were able to recover the gun ultimately taken from Bradshaw's residence by Petitioner's brother, Harold Scott.  (TT. Vol. II. p. 43-47).  The gun was forwarded to the Allegheny County Crime Lab where it was compared with the bullet taken from the victim's body.  It was determined that the bullet removed from Mr. Glenn's body was fired from the revolver ultimately recovered from the person to whom Harold Scott sold it.

In reviewing this evidence, it is clear that the Superior Court's finding of harmless error in admitting the hearsay is not contrary to or an unreasonable application of constitutional or federal law.  Thus, Petitioner is not entitled to federal habeas corpus relief with respect to this claim.

With respect to the alleged hearsay admitted through Detective Logan, Petitioner takes issue with his testimony about Petitioner's confession wherein he spoke about alleged statements made by Darius Greene.  The Superior Court held as to this issue as follows.

> Appellant also contends that the alleged hearsay testimony of Detective Dennis Logan concerning the statements of Darius Green should not have been admitted and that trial counsel was ineffective for failing to object to this evidence.  However, the testimony at issue falls within the co-conspirator exception to the hearsay rule. *See* Commonwealth v. Johnson, _____ Pa. _____, _____, 838 A.2d 663, 675 (2003) (discussing the coconspirator exception).  Thus, we agree with

    the PCRA court that Appellant is not entitled
    to relief on this claim.

Sup. Ct. Mem. at p. 11. at p. 10 (Commw. Ex. 46).[2]

  As the Superior Court held, the "hearsay" testimony
Petitioner objects to was in fact admissible under Pennsylvania
law; therefore, counsel's failure to object to such testimony
cannot have constituted ineffective assistance under the Sixth
Amendment.  Thus, Petitioner is not entitled to habeas corpus
relief with respect to this claim.

    2. Failing to move to suppress statement
      based on fact that later finding of
      probable cause was not determined by a
      neutral and detached magistrate.

  Next, Petitioner asserts that his appellate counsel was
ineffective for failing to raise the issue of trial counsel's
ineffectiveness in failing to move to suppress his statements
based on the fact that the later finding of probable cause was
not founded by a neutral and detached magistrate.  The Allegheny
County Coroner held an inquest in Petitioner's case in lieu of a
preliminary hearing.  PCRA Ct. Op. at p. 6 (Commw. Ex. 45).  In
cases of violent or suspicious deaths, a coroner's inquest may be
held in lieu of a preliminary hearing at which the coroner or his
properly authorized designee may act as committing magistrate or

---

2.  Petitioner's assertion that the co-conspirator exception does not
apply because the Commonwealth did not charge conspiracy is without
merit.  *See* <u>Commonwealth v. Coccioletti</u>,  493 Pa. 103, 112-113, 425
A.2d 387, 392 (1981) (holding that in Pennsylvania, the
co-conspirator exception has been extended to admit declarations by
"co-participants" in a crime even where conspiracy has not been
charged or proven).

issuing authority.  *See* <u>Commonwealth v. Prosdocimo</u>, 331 Pa. Super. 51, 52, 479 A.2d 1073, 1174 (1984).  *See also* <u>Commonwealth v. Smouse</u>, 406 Pa.Super. 369, 594 A.2d 666 (1991) (holding that in cases involving either violent or suspicious deaths, the coroner or his authorized designee may issue and sign criminal complaints).  Thus, there is no basis upon which trial counsel could have complained concerning the issuance of the arrest warrant.

Accordingly, Petitioner is not entitled to habeas relief with respect to this claim.

### 3.   <u>Failure to preserve transcript.</u>

Petitioner's next ineffectiveness claim concerns preliminary hearing counsel's failure to preserve the testimony via a transcript of the hearing.  The PCRA court denied this claim because Petitioner failed to show how he was prejudiced by counsel's failure to request a transcript.

In his Memorandum (doc. no. 2), Petitioner asserts that the transcript of the preliminary hearing would have allowed him to assert procedural defects regarding the Commonwealth's charging process.  However, a jury's guilty verdict renders harmless any error in the charging decision.  <u>United States v. Mechanik</u>, 475 U.S. 66, 73 (1986); <u>United States v. Tulk</u>, 171 F.3d 596, 598 (8 Cir. 1999) ("any injury sustained in the charging process is cured by a subsequent finding of guilt beyond a reasonable doubt").  Thus, the technical validity of the criminal complaint is not reviewable because Petitioner was convicted by a jury in

this case.  Accordingly, Petitioner is not entitled to habeas relief on his claim.

In addition, Petitioner asserts that the preliminary hearing testimony would have allowed him to impeach Detective Logan's testimony in that during the Coroner's Inquest he testified that he had no personal knowledge of the victim's pants pocket being ruffled.  The at the preliminary hearing he testified that Coroner Keyes told him that his pocket was ruffled.  But at trial, Logan testified that he noticed the victim's pocket was ruffled.  Petitioner cannot show prejudice because he had the Coroner's testimony to impeach Logan, there was no need for the preliminary hearing testimony.  Further, impeachment of Logan's testimony in this regard would not affect the outcome of the case based on the quantum of evidence linking Petitioner to the crime.  Therefore, because he has not demonstrated that he suffered any prejudice, Petitioner is not entitled to relief on this claim.

4.  Conflict of interest.

Petitioner's final claim asserts ineffectiveness of pre-trial counsel and trial counsel due to the fact that they all were from the same office, the Public Defender's Office, and therefore, could or would not raise the lower counsel's ineffectiveness.  The Superior Court determined that Petitioner could show no prejudice resulting from this situation as none of the issues raised by Petitioner had any impact on the outcome of the jury's verdict.  Petitioner has not demonstrated that the Superior Court's determination is contrary to, or involved an

23

unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States.
Consequently, Petitioner is not entitled to habeas corpus relief
with respect to this claim.[3]

            5.   <u>Failure to preserve issues for appeal.</u>

    Petitioner also asserts ineffective assistance of appellate
counsel for failing to preserve trial counsel ineffectiveness
issues on appeal.  Again, as all trial counsel ineffectiveness
claims were deemed to be without merit, appellate counsel cannot
be deemed ineffective for failing to preserve them on appeal.
<u>Strickland</u>, 644 U.S. at 691 (holding that counsel is not
ineffective for failing to make a meritless claim).[4]
Consequently, Petitioner is not entitled to relief as to this
claim.

       E.   <u>Certificate of Appealability</u>

    The standards governing the issuance of a certificate of
appealability for appellate review of a district court's
disposition of a habeas petition is codified at 28 U.S.C. §
2253(c), which provides that "[a] certificate of appealability

---

3.  As a final matter, Petitioner asserts that he was denied his
fundamental right to counsel because the conflict of interest
amounted to the complete denial of counsel at a critical stage of his
proceedings, namely, the preliminary hearing.  As noted by
Respondent, Petitioner has not made any showing to support this
assertion and therefore, has not shown any basis for federal habeas
corpus relief in this regard.

4.  Moreover, Petitioner cannot show prejudice because he was able to
bring his appellate counsel ineffectiveness claims in his PCRA
proceeding.

may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  Petitioner has not made any showing that he was denied any of his constitutional rights.  Accordingly, a certificate of appealability should be denied.

III. <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the date of service of the objections to respond thereto.  Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,


/s/   Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge

Dated: September 22, 2006

cc:  Donetta W. Ambrose
     Chief United States District Judge

     Deron Christopher Scott
     DQ-1460
     SCI Greene
     175 Progress Drive
     Waynesburg, PA 15370

25

Paul R. Scholle
Assistant District Attorney
Office of the District Attorney
401 Allegheny County Courthouse
Pittsburgh, PA 15219